## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MARLON BILLOPS (K-04496), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case no. 18-cv-1254 |
| | ) | |
| v. | ) | |
| | ) | Honorable Michael M. Mihm |
| SUSAN PRENTICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AGAINST PLAINTIFF BILLOPS

Susan Prentice, Jason Dyer, Jeremy Whicker, Reginald Brewer, Aberardo Salinas, Gregory Tangman, Jeffrey Maley, and Ryan Battle, ("Defendants"), by and through their attorney, Kwame Raoul, Attorney General for the state of Illinois, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D)(1), hereby provide their motion for summary judgment. In support thereof, Defendants state as follows:

### INTRODUCTION

Plaintiff Marlon Billops filed his complaint on July 11, 2018, alleging constitutional and state law violations arising from two incidents at Pontiac Correctional Center, which occurred on August 4, 2016, and August 8, 2016. [Dkt. 1] On November 8, 2018, the Court allowed Plaintiff to proceed on three categories of claims: (1) Excessive force and state law battery against Defendants Battle, Dyer, Whicker, Maley,[1] and Tangman; (2) Failure to intervene and inhumane conditions of confinement (August 8, 2016) against Defendant Prentice; and (3) Procedural due process violations against Defendants Brewer and Aberardo for disciplinary proceedings. [Dkt.

---

[1] Pursuant to this Court's December 7, 2018 Text Order, the Doe Defendant was substituted as Officer Maley.

12]. Due to the number of Defendants, eight, and the number of distinct claims, three, this summary judgment motion totals 33 pages. The undersigned has endeavored to be concise where possible. The argument page limit complies with the Local Rules of the Central District.

On August 4, 2016, and August 8, 2016, Plaintiff claims excessive force, battery, failure to intervene, inhumane conditions of confinement (including feces on cell walls), and procedural due process violations stemming from subsequent disciplinary proceedings. However, the record precludes any genuine dispute of material fact, compelling summary judgment for Defendants on all claims.

First, regarding the August 4, 2016 incident, Plaintiff pled guilty on May 3, 2024, to aggravated battery, arising out of the incident underlying his section 1983 allegations. [*See* People v. Billops, 18 CF 71, attached hereto as Exhibit 1]. That conviction has never been invalidated or overturned, thus placing his excessive force and battery claims from August 4, 2016 squarely within the bar of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). Furthermore, because he lost good time credit for the August 4 incident—credits that remain unrecovered, under *Edwards v. Balisok*, 520 U.S. 641 (1997) his claims are doubly foreclosed.

Second, regarding the August 8, 2016 incident, Plaintiff received additional disciplinary sanctions and lost good time credit after correctional staff documented his refusal to comply with orders and his covering of cell windows with feces and paper. Specifically, Plaintiff was found guilty on two counts, (1) Impairment of Surveillance and (2) Disobeying a Direct Order, which resulted in 6 Months C Grade/Level and 6 Months segregation. He now seeks to challenge those findings, but there is no evidence that the disciplinary findings were ever reversed or expunged. Consequently, Plaintiff's excessive force and state law battery claims, together with his failure to intervene and procedural due process claims, are barred under *Heck*.

Third, Plaintiff's procedural due process claims against the adjustment committee defendants Salinas and Brewer fail for two reasons: (1) Plaintiff's disciplinary hearings on September 5, 2016—for the August 4 and August 8, 2016 incidents—were not unreasonably delayed; the uncontested record shows that the hearing was delayed because Plaintiff was on suicide watch from August 8, 2016, to August 22, 2016, and level 1 Lockdown from August 22, 2016, through August 30, 2016; (2) the undisputed facts confirm Plaintiff was served with the disciplinary reports, given multiple opportunities to comply, and had every opportunity to request and present witnesses consistent with *Wolff v. McDonnell*, 418 U.S. 539 (1974), and 28 Ill. Admin. Code § 504. Plaintiff received notice of the charges, an opportunity to be heard, and the right to present evidence, none of which he meaningfully pursued.

Finally, no evidence supports Plaintiff's allegations that his cell remained caked with feces against his will or that any Defendant ever used excessive force against Plaintiff. Rather, his own medical and mental health records show that he repeatedly refused to exit his cell while on suicide watch on August 17, 2016, when he was unresponsive under his sheets and was extracted from his cell. Plaintiff departed from the timeline regarding his injuries per his initial claim, now it was the August 17, 2016 extraction where Tangman and Whicker beat him senselessly, contradicting the purported timeline from his complaint, and breaking a rib in the incident and suffering major injuries. However, the only injury assessed was a cut on his lip that was stitched—an injury inconsistent with the allegations of serious harm in his original complaint. Further, it is undisputed that when Plaintiff arrived back in his cell on August 17, 2016, it had been cleaned—the first available opportunity for maintenance to do so in that period. Major Prentice had no authority to place inmates on suicide watch, did not direct staff to assault Plaintiff, and was never informed of any unsafe or unsanitary condition requiring intervention.

Because all of Plaintiff's allegations in his complaint—except for the conditions of confinement claim against Defendant Prentice—either invalidate or necessarily imply the invalidity of the resulting criminal conviction and disciplinary findings, no genuine dispute of material fact remains on those claims. Because Plaintiff cannot show that Defendant Prentice subjected him to inhumane conditions of confinement on August 4 or 8, 2016, and maintenance could not enter Plaintiff's cell between August 8, 2016, and August 17, 2016—due to Plaintiff's own refusal until he was extracted—summary judgment should be granted in favor of Defendants on all counts.

### UNDISPUTED MATERIAL FACTS

1. At all times  to the Complaint, Plaintiff was in the custody of the Illinois Department of Corrections ("IDOC") and incarcerated at Pontiac Correctional Center ("Pontiac"). Dep. of P., 11:5-24.

2. Plaintiff recalls receiving an inmate handbook at orientation and is familiar with it. Dep. of P., 22:2-3.

3. Plaintiff asserts he had another case that was settled in January 2016 involving Prentice, but stated he could not discuss that case because it was closed, and he was barred from ever speaking about it again as part of the settlement agreement in a case filed against Prentice. *See* Dep. of P., 26:16-27:6.

**August 4, 2016 Incident**

4. On August 4, 2016, at around 1:06 PM, Plaintiff was placed in a new cell because of his release from segregation. [Exhibit 7, p. 1]

5. On August 4, 2016, at around 11:47 AM, Officer Battle was assigned to 5 Gallery in East Cell House and Dyer saw Battle escorting Plaintiff down 5 Gallery to Cell 519. [Exhibit 5, p. 1] [Dep. of P., 20, 19:19]

6. Plaintiff was on a hunger strike. Dep. of P., 19: 21-24.

7. Plaintiff asserts that Battle was trying to house him in a cell with someone who was not on a hunger strike, which he believed meant they were not respecting his hunger strike. *See* Dep. of P., 20, 1-7.

8. Plaintiff informed Battle that Cell 519 was occupied and that he could not be in a cell with someone who was not on a hunger strike. *See* Dep. of P., 32:15-19.

9. While moving Billops to Cell 519, Plaintiff refused to go into the cell. [Exhibit 5, p. 6] [Dep. of P., 32:20-22]

10. When Battle and Billops arrived at Cell 519, Billops placed his property in the cell. [Exhibit 5, p. 6]

11. Battle gave Billops a direct order to go into the cell, and Billops refused. *Id.*

12. Battle then told Billops to "cuff up," and Billops replied, "You're not going to cuff me up!" Billops then turned and punched Battle, striking his face. *Id.*

13. Billops then started throwing multiple punches, hitting Battle in the face three or four times. *Id.*; Dep. of P, 20: 8-17; 33:5-10.]

14. At approximately 11:50 AM, Sgt. Gasper and C/O Pitchford responded to a Code 1 on 5 Gallery East Cell House, observing Battle and Dyer struggling to get control of Billops on the ground. C/O Pitchford assisted in getting Billops cuffed up, and Billops was resistant the whole time. [Exhibit 5, p. 3-4]

15. Lt. Punke, assigned to the East Cell House that day, heard a Code 1, hearing that staff needed assistance on 5 Gallery. Upon arrival, he observed C/O Battle heavily bleeding from the face. [Exhibit 5, p. 11]

16. Dyer was on the ground with C/O Pitchford, actively attempting to gain control of Billops, who was actively resistant. Lt. Punke placed Billops into restraints, brought him to his knees, then placed him on his feet, and took him off the gallery to the front area where a nurse decontaminated Plaintiff's eyes with saline solution. *Id.*

17. At or around 1:53 PM, Plaintiff was then escorted to the North Segregation Unit, where he was taken to the holding tank, and restraints were switched out. *Id.*; Exhibit 7, p. 1; Dep. of P., 33:14-19.

18. In or around this time, Plaintiff met with a Mental Health Professional (MPH) and was "not beat up, not battered, not bruised." Dep. of P., 34:3-6.

19. In or around 2:00 PM, Plaintiff was then walked down to his cell in the North Segregation Unit and placed in his new cell. Dep. of P., 35:22-23.

20. Before an inmate is placed on suicide watch, it is standard procedure for the designated cell to undergo a thorough inspection by staff to make sure it is adequately sanitized. [Exhibit 3, ¶ 1]

21. Plaintiff asserts that Whicker, Maley, and Prentice took him to the new cell. *See* Dep. of P., 37:21-24.

22. As Major, Prentice did not have any authority or discretion to place an inmate on suicide watch, as such decisions were made solely by the Mental Health Department at Pontiac Correctional Center. [Exhibit 3, ¶ 10]

23. Plaintiff is suing Prentice only because she failed to intervene while two C/O's "jumped on" him, and for the act of putting him in a cell that Plaintiff had feces on the wall. Dep. of P., 24:4-12.

24. Plaintiff asserts that the allegations against Prentice pertain only to August 4, 2016. Dep. of P., 30:1-3.

25. Plaintiff does not know whether Prentice has medical training. Dep. of P., 30:8-9.

26. Plaintiff never heard Prentice tell any person to jump on him. Dep. of P., 26:10-12.

27. Plaintiff never saw Prentice direct people to jump on him. Dep. of P., 26:13-15.

28. Prentice interacted with Marlon Billops intermittently during her tenure as Major of North Cell House when, on several occasions, he would scream or throw items from his cell. [Exhibit 3, ¶ 8]

29. To the best of her knowledge, Prentice always delegated the handling of Plaintiff's behavioral issues to staff. [Exhibit 3, ¶ 9]

30. Prentice does not recall being present during any incidents of alleged excessive force against Mr. Billops. [Exhibit 3, ¶ 24]

31. Prentice does not recall witnessing any correctional officers, including Defendants Battle, Whicker, or Tangman, using excessive force against Mr. Billops at any time. [Exhibit 3, ¶ 25]

32. Prentice does not recall observing any staff member engaging in inappropriate or unprofessional conduct towards Mr. Billops on or around the dates of the alleged attacks. [Exhibit 3, ¶ 26]

33. No one from Prentice's staff or any other personnel informed her of any alleged threats or imminent danger to Mr. Billops that would have required her intervention. [Exhibit 3, ¶ 27]

34. Prentice has never laughed at, condoned, or participated in any use of excessive force against any inmate, and such behavior is against IDOC policies and contrary to Prentice's personal and professional ethics. [Exhibit 3, ¶ 28]

35. Had Prentice witnessed or been made aware of any use of excessive force or unprofessional conduct by staff, she would have taken immediate action to intervene and report the incidents in accordance with IDOC procedures. [Exhibit 3, ¶ 29]

36. Prentice first learned of the alleged attacks and unsanitary cell conditions when she was contacted in connection with this lawsuit in October 2024, upon being informed that she was a named defendant. [Exhibit 3, ¶ 30]

37. To the best of Prentice's knowledge, she did not observe any conduct that would constitute excessive force or unsanitary conditions as alleged by Marlon Billops, nor was she informed of any such issues during her tenure as Major of North Cell House. [Exhibit 3, ¶ 31]

**August 8, 2016 Incident**

38. On August 8, 2016, at or around 7:00 AM, C/O Edwards, along with C/O Tutoky, were conducting a count on 2 Gallery in North Cell House. *See* Exhibit 6, p. 2-4.

39. Edwards observed Cell 101, which housed Billops, had both observation windows covered with feces and toilet paper. *Id.*

40. Edwards gave Plaintiff three direct orders to uncover the observation windows and respond to the count, all of which were refused. *Id.*

41. Edwards notified Defendant Tangman. *Id.*

42. Tangman responded to N101 as Sgt. Bayler was called via radio to arrive at N Seg 101, due to both observation windows being covered and Plaintiff not verbally responding for the 7:00 AM institutional count. *Id.*

43. Tangman arrived at Cell 101 and observed the large observation windows smeared with feces and the small observation window covered with paper, not allowing visibility into the cell. *Id.*

44. Tangman gave three direct orders to Plaintiff to remove the covering and verbally respond for the 7:00 AM count. *Id.*

45. Plaintiff again refused all orders to take down the coverings and respond for the count. *Id.*

46. When Tangman was giving the third direct order to remove the coverings, inmate Blackburn threw an unknown liquid substance smelling of feces and urine multiple times through the side of the door crack, striking Major Prentice, C/O Edwards, and C/O Tutoky, each struck in multiple areas of the body including the head, face, arms, legs, uniform, and pants. *See* Exhibit 6, p. 5-11.

47. Plaintiff asserts that his neighbor in Cell 102, was helping him out by throwing feces. *Id.*

48. All listed staff members wrote incident reports and were instructed to report to the HCU to fill out their injury paperwork, call the 800-hotline number, and take a shower. *Id.*

49. New uniform shirts and pants were given to staff members. *Id.*

50. Prentice notified Major Cooper of the incident, and the extraction team was activated. *Id.*

51. On August 8, 2016, in or around 8:20 AM, the extraction team was activated to extract Billops from Cell 101 for refusing cell house staff orders. *Id.*

52. C/O Wilson observed extraction team leader C/O Frazier give Billops, who was standing at the back of the cell, three direct orders to come to the cell door and cuff up. *Id.*

53. Billops refused three direct orders to cuff up by team leader Frazier. *Id.*

54. One burst of pepper spray was issued by Frazier into the cell. *Id.*

55. Frazier gave Billops a fourth and fifth direct order to come to the cell door and cuff up. *Id.*

56. At this point, Billops complied with the fifth order and was placed in restraints. *Id.*

57. At around 8:30 AM, Plaintiff was escorted outside the front door of North House and seen by Nurse Williamson for flushing his eyes. *Id.*

58. At around 8:35, Williamson observed a one-and-a-half-inch abrasion on Plaintiff's forehead that required no medical treatment after washing with saline, and Billops reported no other injuries to Nurse Williamson. *Id.* at p. 11.

59. Billops was then escorted to Cell 152 in North Cell House to be searched, and then escorted to the North House holding tank to be seen by Mental Health Professional Brady, for stating he was having suicidal and homicidal thoughts. *Id.*

**Disciplinary Ticket for August 4, 2016 Incident**

60. At 11:50 AM on August 4, 2016, Billops was given two tickets for the incident, one by Dyer, the other by Officer Davidson. [Exhibit 8]

61. Plaintiff remembers being disciplined for assaulting staff member. Dep. of P., 18, 16-19.

62. Plaintiff was found guilty by the adjustment committee for the August 4, 2016, incident for violent assault of any person -staff, receiving 1 Year C Grade, Indeterminate segregation,

Revoke GCC, GGT 1 Year, 1 year commissary restriction, 1 year Audio/visual restriction, 6 months Contact Visits Restriction. [Exhibit 4, p. 3]

63. On September 5, 2016, at around 2:05 PM, the adjustment committee held a hearing for the August 4, 2016 incident. [Exhibit 8]

64. The Committee noted that there was a delay in the hearing process because Plaintiff was on suicide watch from August 8, 2016, to August 22, 2016, and level 1 Lockdown from August 22, 2016, through August 30, 2016. *Id.*

65. The Committee noted, in their basis for the decision of finding Plaintiff guilty for violent assault of Battle, that Billops continued to strike Battle about the head and face until additional security staff arrived. *Id.*

66. Billops was Mirandized and elected not to provide statement pertaining to the assault. *Id.*

67. The Administrative Review Board denied Plaintiff's grievance alleging that he was not served a ticket and the tickets were not heard within 14 days [Exhibit 11, 2-3]

68. Plaintiff was served with a copy of the Disciplinary Report. *Id.*

69. Plaintiff did not request any witnesses. *Id.*

**Criminal Conviction for August 4, 2016 Incident**

70. On May 3, 2024, Plaintiff pleaded guilty to Aggravated Battery of Defendant Battle on August 4, 2016, a Class 3 Felony. [Exhibit 1, p. 3-5]

71. On May 3, 2024, Plaintiff was sentenced to two years and six months in IDOC custody plus six months of mandatory supervised release for aggravated battery of Defendant Battle on August 4, 2016. *See id.*

**Disciplinary Ticket for August 8, 2016 Incident**

72. At 7:05 AM on August 8, 2016, Billops was given two tickets for the incident, one by Tangman, the other by C/O Edwards. [Exhibit 9]

73. At 8:21 AM on August 8, 2016, Billops was given a ticket for the incident from Tact Team Leader Frazier. *Id.*

74. On September 5, 2016, at around 2:06 PM, the adjustment committee held a hearing for the August 8, 2016 incident. *Id.*

75. The Committee noted that there was a delay in the hearing process because Plaintiff was on suicide watch from August 8, 2016, to August 22, 2016, and level 1 Lockdown from August 22, 2016, through August 30, 2016. *Id.*

76. Plaintiff was found guilty by the adjustment committee for the August 8, 2016, incident, for Impairment of surveillance and Disobeying a Direct Order, receiving 6 months C Grade and 6 Months segregation. [Exhibit 4, p. 3]

77. The Committee noted, in their basis for the decision of finding Plaintiff guilty of Impairment of surveillance and Disobeying a Direct Order, that there were three combined tickets for the incident. [Exhibit 9]

78. Billops pleaded guilty to the offenses, stating, "Yeah, I had windows covered. I took the tissue down; I didn't take the shit down. I didn't refuse to cuff up for the team, I couldn't understand them." *Id.*

79. The Committee noted, in their basis for the decision of finding Plaintiff guilty of the two violations, that Billops had the observation windows covered with feces and toilet paper, that the reporting Lt. Tangman gave Billops three direct orders to remove the covering and verbally respond for count, and Billops refused all orders. *Id.*

80. The extraction team was activated and gave Billops three direct orders to cuff up, and Billops refused. *Id.*

81. The Committee based their decision on Plaintiff's admission of guilt for the incident, and the incident report substantiating the incident. *Id.*

82. Plaintiff is suing Reginald Brewer because he found Plaintiff guilty based on the written statements made by Internal Affairs. Dep. of P., 39:22-40:1-3.

83. Brewer and Salinas were at the adjustment committee hearing; Plaintiff did not communicate with either about which defendants he wanted to produce during the hearing. Dep. of P., 50:1-5.

84. Plaintiff did not try to contact any witnesses from nearby cells, Cell 17 or 19. Dep. of P., 50:16-19.

85. Plaintiff could have asked the facility for information identifying witnesses but did not. *See* Dep. of P., 50:21-23.

86. The Administrative Review Board denied Plaintiff's grievance alleging that he was not served a ticket and admitting to covering up the cell window, saying the tickets were not heard within 14 days should have been afforded witnesses. [Exhibit 11, p. 4-5]

**Incidents Between August 8, 2016, and August 17, 2016**

87. Staff members are responsible for conducting cell inspections, and any issues discovered, such as unsanitary conditions, are addressed prior to the inmate's placement in the cell. Exhibit 3, ¶ 12.

88. If a cell required cleaning, inmates assigned to cleaning duties would be dispatched to clean the cell under supervision. Exhibit 3, ¶ 13.

89. Prentice did not personally inspect Cell 102, or any other cell assigned to Mr. Billops during her tenure as Major of North Cell House. Exhibit 3, ¶ 14.

90. Prentice had no awareness, knowledge, or observations of feces on the walls or doors of Cell 101, Cell 102, or any cell assigned to Mr. Billops in or around August 2016. Exhibit 3, ¶ 15.

91. No one from Prentice's staff or any other personnel informed her of any complaints from Mr. Billops regarding unsanitary cell conditions involving feces. Exhibit 3, ¶ 16.

92. If Mr. Billops had made a complaint to Prentice regarding unsanitary cell conditions, she would have taken appropriate measures, including assessing the situation and arranging for the cell to be cleaned or for Mr. Billops to be relocated if necessary. Exhibit 3, ¶ 17.

93. It is Prentice's understanding and belief that Pontiac Correctional Center maintains suitable housing conditions for all individuals in custody, and that cells are inspected and cleaned regularly. Exhibit 3, ¶ 18.

94. Prentice was never personally involved in tasks such as cleaning cells or addressing maintenance issues. Exhibit 3, ¶ 19.

95. No one staff member ever informed her that feces on the walls was causing or could cause health or safety issues to any inmate at Pontiac C.C. Exhibit 3, ¶ 20.

96. Cleaning logs and records were maintained by the facility during Prentice's tenure as Major and she remains confident that standard cleaning procedures in North Cell House were followed during that time even if such logs and records may no longer be available. Exhibit 3, ¶ 21.

97. If there were feces on the walls in any cells, that would only have been addressed by the assigned correctional staff and would not have been brought to Prentice's attention unless it escalated to a significant issue requiring her involvement. Exhibit 3, ¶ 22.

98. Prentice has no awareness of any systemic issues at Pontiac Correctional Center that caused inmates to not receive necessary cleaning supplies or to be housed in unsanitary conditions during her tenure as Major in North Cell House. Exhibit 3, ¶ 23.

99. On August 8, 2016, at around 11:30 AM, Plaintiff was placed in a new cell for routine placement, and stayed there until he was moved again on August 30, 2016, for routine placement. [Exhibit 7, p. 1]

100. Between August 8 and August 29, 2016 Plaintiff was seen for daily suicide watch and no injuries due to feces on the wall were reported. *See* Exhibit 10, p. 2-22.

101. On August 10, Plaintiff stood in the center of his cell, shrugged his shoulders, and would not engage with the MHP. *Id.* at 9.

102. Plaintiff asserts that his new cell was already covered in feces and asked for cleaning materials every day through August 16 or 17th but did not receive any. *See* Dep. of P., 44:9-45:4.

103. On August 15, 2016, Plaintiff was seen again for daily suicide watch, where security reported he was covering his cell window with his smock, refusing to come out of the cell to allow it to be cleaned despite complaining of feces on the wall. [Exhibit 10, p. 13]

104. On August 16, 2016, Plaintiff told his MHP that he was okay. *Id.* at 15.

105.	On August 17, 2016, Plaintiff was extracted from his cell by security after he had been unresponsive under his blanket and taken to Urgent Care for his lip, which was tended to. *Id.* at 16.

106.	Plaintiff had tissues and put them up on the walls. *See* Dep. of P., 45:9-11.

107.	Since Plaintiff would not take down the tissues, Prentice came with Tangman, Whicker, and two other officers to talk Plaintiff into removing the paper. Tangman told Plaintiff to take it down, at which point Tangman entered his cell. *See* Dep. of P., 46:2-24.

108.	Plaintiff asserts that Defendant Whicker ran in with a shield and pushed Plaintiff to the back of the cell without a reason. *See* Dep. of P., 43:5-8.

109.	The responding officers were not in tact gear and did not ask Plaintiff to cuff up. Dep. of P., 47:1-7.

110.	Plaintiff claims his rib was broken but never got an X-ray of it. Dep. of P., 55:18-20.

111.	X-rays of Plaintiff's head and forearm were conducted, but the only medical treatment consisted of stitches to Plaintiff's lip. Dep. of P., 54:20-55:15.

112.	The X-ray of Plaintiff's forearm showed that it was not broken. Dep. of P., 55:22-56:1.

113.	Plaintiff was treated with Ibuprofen for all injuries alleged in the complaint and does not currently feel any pain from those injuries. Dep. of P., 56:4-9.

114.	By the time the grievance counselor received Plaintiff's grievance regarding the August 17, 2016, incident, Plaintiff's issue had already been addressed. [Exhibit 11, p. 6]

115.	When Plaintiff got back to his cell on August 17, the cell had been cleaned. Dep. of P., 47:8-19.

116.     On August 21, Clinician Duckworth noted that Plaintiff stated he was "alright" and "not suicidal" but was unable to evaluate Plaintiff as he was not cooperating. [Exhibit 10, p. 18]

## STANDARD OF REVIEW

Summary judgment is appropriate and shall be rendered when the pleadings, depositions, answers to interrogatories, together with affidavits, show no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986). Moreover, "Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Id.* at 322.

The initial burden of the moving party is to establish that there is no question of fact that will be outcome determinative in the case. *Id.* Once the moving party has met this burden, the opposing party must go beyond its pleadings and set forth specific facts that show there is a genuine issue of material fact. *Id.* The opposing party cannot rely on general conclusory allegations, but rather "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Valentine v. Joliet Township Highschool Dist.*, 802 F.2d 981, 986 (7th Cir. 1986). All inferences from the record must be viewed in a light most favorable to the non-moving party. *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir. 1990). However, the court is not required to evaluate every conceivable inference that can be drawn from evidentiary matters, only reasonable ones. *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 886 (7th Cir. 1989). Moreover, when opposing parties tell two different stories, one of which is blatantly contradicted by the records that no reasonable jury could believe it, a court should not adopt that version of the

facts to rule on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). If the evidence is only colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

Moreover, the non-moving party may not defeat a motion for summary judgment by simply resting on its pleadings. *Beard v. Whitley*, 840 F.2d 406, 410 (7th Cir. 1988). Rather, Rule 56(c) requires the non-moving party to go beyond its pleadings and demonstrate the existence of a genuine issue for trial by designating specific facts in its own affidavits, or by depositions, answers to interrogatories and admissions on file. *Celotex*, 477 U.S. at 324. The plaintiff must come forward with evidence of specific factual dispute, evidence that would reasonably permit the finder of fact to find in Plaintiff's favor on a material question; otherwise, the court must enter summary judgment against the Plaintiff. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *International Union of Operating Engineers v. Associated General Contractors*, 845 F.2d 704, 708 (7th Cir. 1988). It is, as the seventh Circuit has frequently noted, the "put up or shut up" phase of litigation. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

## ARGUMENT

### I. PLAINTIFF'S EXCESSIVE FORCE, STATE-LAW BATTERY, FAILURE TO INTERVENE, AND PROCEDURAL DUE PROCESS CLAIMS ARE BARRED UNDER *HECK V. HUMPHREY.*

Plaintiff brings Eighth Amendment excessive force claims against Defendants Battle, Dyer, Whicker, Maley, and Tangman for an incident that occurred on August 4, 2016; excessive force claims against Defendants Tangman and Whicker, and failure to intervene claim against Defendant Prentice for an incident that occurred on August 8, 2016. 21, 2018. Plaintiff's excessive force claims and failure to intervene claims are barred by *Heck v. Humphrey* because he plead guilty to Class 3 Felony Assault on May 3, 2024, for the August 4, 2016 incident. SOF ¶¶ 70-71.

And he lost good time credit and was found guilty of assault by the Adjustment Committee for the same event on September 5, 2016. SOF ¶¶ 63-66. Further, he was found guilty of Interference with Surveillance and Disobeying a Direct Order Essential to safety and security of the Institution for the August 8, 2016 incident and lost good time credit. SOF ¶¶ 76-77. Importantly, Plaintiff pleaded guilty to the August 8, 2016 offenses at his hearing on September 5, 2016, asserting "Yeah, I had windows covered. I took the tissue down; I didn't take the shit down. I didn't refuse to cuff up for the team, I couldn't understand them." SOF ¶ 78.

A plaintiff may not bring an action under 42 U.S.C. § 1983 for violations of his constitutional rights if, in order to prevail in that action, the validity of his conviction or sentence must be called into question. *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). Under *Heck*, a section 1983 claim may not proceed if a favorable ruling "would necessarily imply the invalidity of a conviction or sentence." *Id*. "[F]or this purpose the ruling of a prison disciplinary proceeding is a conviction." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011) (*citing Edwards v. Balisok*, 520 U.S. 641 (1997)). Accordingly, "if [a Plaintiff] makes allegations [in a civil suit] that are inconsistent with the convictions having been valid, *Heck* kicks in and bars his civil suit." *Okoro v. Callaghan*, 324 F.3d 488. (7th Cir. 2003); *see also Dixon v. Chrans*, 101 F.3d 1228, 1230–31 (7th Cir. 1996) (a claim for damages that necessarily questions the validity of a sentence imposed by a prison disciplinary committee is barred by *Heck*). Thus, claims that "necessarily imply the invalidity of the deprivation of [an inmate's] good time credits" are not cognizable undersection 1983. *Balisok*, 520 U.S. at 646.

"To properly apply *Hack*'s bar against certain damage actions, a district court must analyze the relationship between the plaintiff's § 1983 claim and the charge on which he was convicted." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) *(quoting Van Gilder v. Baker*,

435 F.3d 689, 691 (7th Cir. 2006)). "The *Heck* rule is analogous to collateral estoppel: an issue determined with finality in a full and fair adjudicative proceeding (and essential to the decision in that proceeding) cannot be reopened in a subsequent case." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011). *Heck* prohibits a prisoner from challenging a finding in a prison discipline case that was essential to the decision in that case. *Id.* (citing *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003)).

The incidents Plaintiff alleges in his complaint arising from August 4, 2016 and August 8, 2016 were also the basis of disciplinary hearings and tickets issued to Plaintiff. SOF ¶¶ 60-64, 72-76. Specifically, on September 5, 2016, Plaintiff went to an Adjustment Committee hearing for both incidents, where Plaintiff received a total of five tickets as a result of the incidents and the tickets was heard back-to-back by Defendants Brewer and Aberardo. SOF ¶¶ 82-83. The Adjustment Committee's decision was based on Defendants' reports; Plaintiff was served a copy of the Disciplinary Report. SOF ¶¶ 64-68, 83-86.

By failing to mention of any of unlawful acts that he was found to have committed on August 4, 2016 or August 8, 2016 incidents in his Complaint, Plaintiff has pleaded facts that are inconsistent with the findings of the Adjustment Committee. *Okoro*, 324 F.3d at 490. ("Okoro adhered steadfastly to his position that ... he was framed; in so arguing he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit.").

Plaintiff's insistence that he was the victim of excessive force and battery by Battle, Dyer, Whicker, Maley, and Tangman on August 4, 2016, and that Prentice failed to intervene regarding Whicker and Tangman's alleged battery of Plaintiff on August 8, 2016—and that the incident did not happen as they reported—calls into question the disciplinary findings. *See Purnell v. McCarthy*, 2017 WL 478301, at *5 (N.D. Ill. Feb. 6, 2017) (finding that Plaintiff's insistence that

he presented no danger and that Defendants acted without justification requires dismissal of claim pursuant to *Heck*). The statements in the reports were an essential part of Plaintiff's disciplinary charges, and Plaintiff's account of the events is in direct contradiction with the evidence the Adjustment Committee relied on to find him guilty on all counts. *Viramontes v. City of Chicago*, 840 F.3d 423, 427–28 (7th Cir. 2016). Thus, Plaintiff's claims can only proceed if he proves that his discipline has been overturned. *Wooten v. Law*, 118 Fed. Appx. 66, 69 (7th Cir. 2004). Plaintiff has not done so. Given that Plaintiff's depiction of the events is irreconcilably inconsistent with the disciplinary findings from the August 4, 2016 and August 8, 2016, respectively—all claims but the conditions of confinement claim and August 17, 2016 incident in which Plaintiff was unresponsive under his blanket and subsequently extracted from his cell, and received stitches on his lip—are barred by *Heck*.

If Plaintiff were to prevail on his claims against Defendants Dyer, Whicker, Tangman, Maley, and Battle, it would invalidate Plaintiff's criminal conviction for assault related the August 4, 2016 incident. It would imply the invalidity of the findings made by and discipline imposed by Adjustment Committee. If Plaintiff were to prevail on his excessive force claims against Defendants Whicker and Tangman for the August 8, 2016 incident, it would invalidate the findings made by and discipline imposed by Adjustment Committee. Lastly, if Plaintiff were to prevail on his failure to intervene claim against Defendant Prentice, it would invalidate the findings made by and discipline imposed by Adjustment Committee—as it would if Plaintiff prevailed on his procedural due process claims against Defendant Brewer and Aberardo. As such, Plaintiff's claims of excessive force, state-law battery, failure to intervene, and violations of procedural due process are barred by *Heck*. Seventh Circuit has made it explicitly clear "*Heck*-barred claims must be dismissed." *Morgan v. Schott*, 914 F.3d 1115, 1122 (7th Cir. 2019).

This case is similar to *Walker v. Gramley*, where the court held that the plaintiff's excessive force claim was barred under *Heck* because in order for the plaintiff to "prevail on his excessive force claim, he would need to undermine the Disciplinary Committee's findings and the Disciplinary Committee's imposition of punishment on him as a result of this incident." 2014 WL 4668662, at *2 (C.D. Ill. Sept. 19, 2014). In *Walker*, Plaintiff alleged that prison guards body slammed him and shot him in the face, but the court found that because there was a disciplinary hearing about this same incident that found plaintiff guilty, *Heck* barred further review. *Id.* Here too, *Heck* bars all of Plaintiff's claims except for the conditions of confinement claim and August 17 extraction incident due to (1) Plaintiff's criminal conviction for assault regarding the August 4, 2016, incident and (2) the discipline imposed upon him for the August 4, 2016, and August 8, 2016 incidents, respectively.

## II. PLAINTIFF CANNOT SHOW THAT DEFENDANTS SALINAS AND BREWEER VIOLATES HIS DUE PROCESS RIGHTS

The undisputed facts do not permit a finding that Plaintiff is entitled to summary judgment against Defendant Salinas and Brewer. When a plaintiff who bears the burden of proof on his claim moves for summary judgment, he may prevail only if he can "lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Sweet v. Int'l Services, Inc.*, 2018 WL 5279313, at *3 (N.D. Ill. Oct. 24, 2018) (*quoting Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015)).

The undisputed evidence shows that Plaintiff's due process claim fails as a matter of law and is precluded by the remedies available to him in state court. *See Armato v. Grounds*, 766 F.3d 713, 722 (7th Cir. 2014) (holding plaintiff's claim failed as a matter of law and was precluded by state court remedies where the inmate utilized the grievance process and had

numerous state court remedies available). As such, summary judgment should be granted in favor of Salinas and Brewer, and against Plaintiff on his due process claim. "The basic requirements of due process are notice and an opportunity to be heard." *Crayton v. Duncan*, 2015 WL 2207191, at *6 (S.D. Ill. May 8, 2015)

Here, Plaintiff had an opportunity to be heard before the Adjustment Committee on September 5, 2016—for both the August 4 and August 8, 2016 incidents. SOF ¶¶ 65-69, 77-81. Accordingly, even if the Court does not find that Plaintiff's due process claim is barred under *Heck*, Defendants are entitled to judgment as a matter of law because (1) It is undisputed that the Administrative Review Board affirmed both decisions after reviewing Plaintiff's grievances (2) Plaintiff received copies of his disciplinary reports for the tickets issued for both incidents, (3) Plaintiff had the opportunity to call witnesses, but simply did not, and (4) any delay was due to the fact that Plaintiff was on suicide watch through August 22, 2016 and was on a level 1 Lockdown through August 30. SOF ¶¶ 64-69, 75-84.

As the *Murdock* court held, if offenders "disagree with IDOC's host site determination, they can challenge the determination or file a grievance, which may lead to a new investigation of the parolee's release plan." *Murdock v. Walker*, 2014 WL 916992, at *11 (N.D. Ill. Mar. 10, 2014). The evidence shows that Plaintiff was able to file grievances within the prison grievance system. SOF ¶¶ 84-86. Moreover, the grievance process is an appropriate and effective means of *se*eking review of a parole agent's decision regarding a host site. *Murdock*, 2014 WL 916992, at *11. "[T]he fact that this procedure did not have a favorable outcome does not mean that plaintiff was denied due process." *Crayton*, 2015 WL 2207191, at *6. Thus, the existing process sufficiently protected Plaintiff's procedural due process rights.

### III. PLAINTIFF CANNOT SHOW THAT DEFENDANTS TANGMAN AND WHICKER USED EXCESSIVE FORCE ON AUGUST 8, 2016, OR AUGUST 17, 2016.

Even if the Court does not find that *Heck* bars Plaintiff's excessive force claims, Defendants Tangman and Whicker are entitled to judgment as a matter of law because there is no evidence that they used excessive force or committed battery on August 8, 2016, or August 17, 2016. The relevant inquiry for excessive force claims is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citation omitted). In making this determination, courts may examine several factors, "including the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). Case law makes clear that the relevant inquiry is the amount of force used, not the nature of the plaintiff's injuries. *Hudson*, 503 U.S. at 9; *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (vacating dismissal of excessive-force claim because district court erroneously focused on extent of injury rather than nature of force applied).

First, Plaintiff provides no proof that Defendants' use of force was done with intent to cause "malicious and sadistic" harm. This is because Plaintiff was found guilty for disobeying a direct order for the alleged incident on August 8, 2016.

The Seventh Circuit states how important it is that prisoners follow orders:

Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Soto v. Dickey*, 744 F.2d 1260, 1267–70 (7th Cir.1984)

When inmates refuse to obey orders given by prison staff, "some means must be used to compel compliance, such as a chemical agent or physical force." *Kervin v. Barnes*, 144 F. App" x 551, 552 (7th Cir. 2005) ("This court has held that prison guards may use chemical sprays when reasonably necessary to subdue recalcitrant prisoners, for orders must be obeyed, and there are only so many choices available to correctional officers when inmates refuse."). "Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm… the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline." *Williams v. Burton*, 943 F.2d 1572, 1575–77 (11th Cir. 1991) *citing Whitley v. Albers,* 475 U.S. 312, 320–21 (1986).

Second, Plaintiff provides no proof that Defendants' use of force was done with intent to cause "malicious and sadistic" harm on August 17, 2016 either. Plaintiff initially alleged punching, kicking, and head injuries on August 8 in his complaint. Dkt. 1 But the undisputed record shows the allegations in his initial complaint are entirely inconsistent with medical findings and Plaintiff's own deposition testimony. *See* SOF ¶¶ 23-24, 58, 105. Specifically, the August 17 extraction incident arose when staff found Plaintiff unresponsive under his blanket and refused to remove the paper covering the window into his cell. SOF ¶¶ 105-108. Upon Plaintiff's cell extraction, X-rays were conducted on Plaintiff's head and forearms showing *nothing* was broken. SOF ¶¶ 110-112. Rather, Plaintiff, who insisted he had broken ribs from the incident, actually just had a cut on his lip that was stitched up while at the hospital. *Id.* It is undisputed that Plaintiff was treated with Ibuprofen for all injuries alleged in the complaint and does not currently feel any pain from those injuries. SOF ¶ 105, 113. And importantly, on August 21, Plaintiff, told clinician Duckworth in

his daily suicide watch visit that he was "alright." SOF ¶ 116. Accordingly, there is no evidence that Defendant Tangman kneed Plaintiff in the face, or that Whicker kicked him in the ribs while Plaintiff was on the floor.

Guided by the factors in *Fillmore*, the evidence establishes: (1) there was a legitimate need for force in both instances to prevent Plaintiff from assaulting further staff given Plaintiff's status on suicide watch per his medical records; (2) the amount of force applied would have been minimal at most given Plaintiff's dearth of serious injuries for both incidents; (3) Defendants reasonably perceived a threat upon themselves and other staff members given Plaintiff's unresponsiveness or disobedience in both incidents; and (4) Plaintiff had no apparent injury other than a cut on his lip that was sutured immediately. *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). In the absence of evidence regarding Defendants' malicious or sadistic motivations, Plaintiff's allegations fail under the excessive force standard. Therefore, summary judgment should be entered in Defendants favor on all Plaintiff's excessive force and state law battery claims.

## IV.    PLAINTIFF CANNOT SHOW THAT DEFENDANT PRENTICE FAILED TO INTERVENE.

Defendant Prentice is entitled to judgment as a matter of law because there is no evidence that she failed to intervene on the 4th, 8th, or 17th of August 2016. In order to establish a claim for failure to intervene, a plaintiff must demonstrate that the officer had reason to know excessive force was being used and had a realistic opportunity to prevent the harm from occurring. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). A realistic opportunity to intervene exists where the officer could have called for backup or help or at least cautioned the officer using excessive force to stop. *Abdullahi*, 423 F.3d at 774. An officer who was not present at the scene of the use of force cannot be held liable for failure to intervene. *See Flores v. Giuliano*, No. 12 C 162, 2014 WL 3360504, at *9 (N.D. Ill. July

9, 2014) (watch commander not present at the scene was entitled to summary judgment on failure-to-intervene claim); *Heard v. City of Chicago*, No. 10 C 01050, 2013 WL 1337167, at *5 (N.D. Ill. Mar. 29, 2013) (granting summary judgment for the defendant officer on excessive force and battery claims where the officer was not present by the plaintiff's own admission).

Plaintiff provides no proof other than his own uncorroborated assertions—simultaneously at odds with his own admission of the lack of injuries and medical findings—that he was actually kneed in the face by Defendant Tangman or kicked in the ribs or "uppercut" while laying on the floor as Prentice watched. SOF ¶¶ 25-35. "[S]urviving summary judgment requires evidence, not assumptions;" "mere speculation or conjecture" is insufficient to create a factual dispute to defeat summary judgment. *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768-69 (7th Cir. 2015).

Here, it is undisputed that Plaintiff is suing Prentice only because she failed to intervene while two C/O's "jumped on" him, and for the act of putting him in a cell that Plaintiff had feces on the wall. SOF ¶ 23. It is also undisputed that Plaintiff never heard Prentice tell any person to jump on him nor did he ever see Prentice direct anyone to jump on him. SOF ¶¶ 26-27. It is also undisputed that Plaintiff was treated with Ibuprofen for all injuries alleged in the complaint, X-rays showed no broken bones, and he was "alright" on August 21. SOF ¶¶113-114, 116. As such, Plaintiff's claim for failure to intervene against Defendant Prentice must be dismissed.

## V.    PLAINTIFF CANNOT SHOW THAT PRENTICE SUBJECTED PLAINTIFF TO INHUMANE CONDITIONS OF CONFINEMENT.

In order to prove an Eighth Amendment violation based upon conditions of confinement, the Plaintiff must satisfy a two-part test: (1) the conditions were objectively serious as to be considered cruel and unusual; and (2) the defendants acted with sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). As to the first component, only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the

basis of an Eighth Amendment violation. *Id*. Only extreme deprivations can establish this component. *Henderson v. Sheahan*, 196 F. 3d 839, 845 (7th Cir. 1999). Conditions that merely cause discomfort or inconvenience, or are restrictive or harsh, do not rise to the level of constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

As to the second component, the official must have a state of mind that is deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). An official violates the Eighth Amendment only if he or she acted with deliberate indifference to a prisoner's serious needs. *Smith v. Sangamon County Sheriff's Dept.,* 715 F.3d 188, 191 (7th Cir. 2013). Deliberate indifference occurs when an official "knows of and disregards an *excessive* risk to an inmate's health." *Farmer*, 511 U.S. at 837. (emphasis added).

### A. Plaintiff fails to state a claim regarding the conditions of his confinement

Plaintiff's complaint describes temporary inconveniences that he subjected himself to—not extreme deprivations cognizable under the Eighth Amendment. Courts have repeatedly recognized prison conditions are not unconstitutional simply because they are harsh and restrictive; such conditions are "part of the penalty that criminal offenders pay for their offenses against society." *Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir.1987). Moreover, Plaintiff's own testimony has established that he has not been damaged in any way by the conditions of confinement. *Robinson v. Ill.st. Corr. Center Warden*, 890 F. Supp. 715, 720 (N.D. Ill., 1995) *Sain*, at 888-889; *Gurley v. Sheahan*, 2009 WL 2178685 at *5 (N.D. Ill. 2009); *Gray v. Hardy*, 2013 WL 5433280 at *6.

Here, Plaintiff claims that his cell had feces on the walls. SOF ¶ 102. These allegations are insufficient to state a conditional violation. *See e.g.*, *Sanchez v. McCann*, 2010 WL 1408917, at *3 (N.D. Ill. 2010) (holding that Plaintiff's claims of lead paint undercoats on the walls and rust in

his cell are not the kind of deprivation of basic human needs redressable under the eighth amendment); *see also Schwaub v. Scott,* 2016 WL 347658, at *2 (C.D. Ill. 2016); *Walker v. Dart*, 2010 WL 669448, at *3 (N.D. Ill. 2010); *Jones v. Mitchell*, 1994 WL 517202, at *3-4 (N.D. Ill. 1994). More importantly, Plaintiff had no physical injuries as a result of the feces. SOF ¶ 113. Plaintiff's medical records show no evidence of him experiencing any physical or psychological harm as a result of the feces. *See* SOF ¶ 100. Rather, Plaintiff simply refused to leave his cell with feces on the wall while on suicide watch so it could not be cleaned. *See* SOF ¶¶ 100-106, 114. Indeed, it is undisputed that the only time that was sufficiently available for IDOC employees to clean Plaintiff's cell during his August suicide watch they did so—during Plaintiff's trip to the hospital to get his lip stitched on August 17. SOF ¶¶ 114-115. Like *Schwaub*, Plaintiff's conditions of confinement claim fails. To be sure, "failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not." *Carroll*, 255 F.3d at 742.

Here, Plaintiff claims that the tissues he had were insufficient. Dkt. 1; SOF ¶ 106. However, in a more egregious case, courts have found claims related to lack of cleaning supplies does not set forth a constitutional claim. In *Sanchez*, the plaintiff was housed in segregation and was not provided any cleaning supplies. *Sanchez v.* Walker, 2010 WL 5313815, at *9 (N.D. Ill. 2010). The court noted that while he was in general population the plaintiff would clean his cell using a weekly cleaning agent and his own clothes for the walls. *Id.* The court reasoned that Plaintiff could have used water and his own clothes to clean his segregation cell. *Id.* As a result, the court held that the lack of cleaning supplies did not amount to a claim of unconstitutional conditions of confinement claim. *Id.* Here, while Plaintiff believes the materials available to him were insufficient, he used them to cover the windows looking into his cell; his belief does not rise to a constitutional violation

because he subjected himself intentionally to the condition and staff could not go in and clean it based on his threat level at the time, yet still cleaned it at the first opportunity.

**B.      Taken in combination, Plaintiff's Complaint does not create a triable issue of fact.**

In *Bentz v. Hardy* and *Gray v. Hardy*, The Seventh Circuit held while Plaintiffs' complaints analyzed separately do not rise to the level of a constitutional violation, taken together, the complaints create a triable issue of fact as to whether the conditions complained of constitute cruel and unusual punishment. *See Bentz v. Hardy*, 638 F. App" x 535 (7th Cir. 2016); *Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016).

However, the present case is quite dissimilar to both *Bentz* and *Gray*.  In both *Bentz* and *Gray*, the pest issue was exacerbated by issues with broken windows that allowed pests easy entry to the cell house and rendered corrective pest control actions by the prison ineffective. *Bentz*, at 538 ("the monthly sprayings may have been rendered entirely ineffective by the broken window"); *Gray,* at 1006 ("The broken windows both exacerbate the situation and render ineffective some of the prison's efforts to address the problem" ). In the present case, the other complained of conditions – inadequate cleaning supplies and feces on the wall are rendered moot by the fact that the prison could not address the problem while Plaintiff was in his cell. Moreover, none of those complaints are as serious as the broken window claim and when added to the pest complaint do not result in the same of a cruel and unusual punishment claim.  For these reasons, Plaintiff's complaints fail to create a question of fact and summary judgment is therefore appropriate.

Furthermore, even if the cell had feces on the walls, liability still cannot attach to Defendant Prentice, who averred that the Maintenance Department were in charge of cell issues.  SOF ¶¶ 87-88. Prentice averred that any time an inmate brought up such issues, she would refer it to the Maintenance Department; still, No one from Prentice's staff or any other personnel informed her

of any complaints from Mr. Billops regarding unsanitary cell conditions involving feces. SOF ¶¶ 90-92. Defendant Prentice deferred to their judgment as well as the reports when dealing with inmate complaints regarding the cell conditions.  SOF ¶ 94. Defendant Prentice reasonably relied on the information given to her, so she cannot be held liable under the Eighth Amendment.

C. **Plaintiff has no evidence that he suffered cognizable harm from the alleged feces on the wall.**

In *Gray v. Hardy*, the Seventh Circuit noted that an inmate must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the unsanitary environment, and that the deliberate indifference caused that harm. 826 F.3d 1000, 1007 (7th Cir. 2016). While Courts have recognized that a Plaintiff may present a "common-sense link" of harm to the conditions, Plaintiff has failed to establish such a link in this case. *Contra Gray*, 826 F.3d at 1007.

In this case, Plaintiff lacks the foundation to establish the cause of any issues he may have had. Plaintiff was never treated by a medical professional in relation to feces on cell walls at Pontiac. SOF ¶ 100.  Plaintiff has no evidence linking the alleged feces on the wall to any injury. Plaintiff attempts to link harm to Defendant Prentice's acts or omissions, but has no admissible evidence to do so. Plaintiff has no proof that suffered cognizable harm as a result of any feces on the wall. Therefore, his claim fails as a matter of law.

WHEREFORE, based on the foregoing and the reasons stated in his Motion, Defendants respectfully request that this Court enter summary judgment in this case, enter judgment in favor of Defendant, and against Plaintiff, and grant such further relief as this Court finds reasonable and just.

Dated: January 13, 2025                                Respectfully submitted,

KWAME RAOUL                                          */s/ Carl S. Stier*

Attorney General of Illinois

Carl Stier
Assistant Attorney General
General Law Bureau
115south LaSalle St., 28th Fl.
Chicago, Illinois 60603
773-835-0637
carl.stier@ilag.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| MARLON BILLOPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 18-1254-MMM |
| | ) | |
| SUSAN PRENTICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2025, the foregoing document, Defendant's *Motion for Summary Judgment Against Plaintiff Billops*, was electronically filed with the Clerk of the Court using the CM/ECF system. And I hereby certify that on the same date, I caused a copy of the foregoing described document to be mailed by United States Postal Service, in an envelope properly addressed and fully prepaid, to the following non-registered participant:

Marlon Billops, K04496
Pontiac Correctional Center
Inmate Mail/Parcels
P.O. Box 99
Pontiac, Illinois 61764

Dated: January 13, 2025

KWAME RAOUL
Attorney General of Illinois

Respectfully submitted,

*/s/ Carl S. Stier*
Carl Stier
Assistant Attorney General
General Law Bureau
115 S. LaSalle St., 28th Fl.
Chicago, Illinois 60603
773-835-0637
carl.stier@ilag.gov